

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Lewis M. Levin                          :
c/o Haines & Associates                 :
1835 Market Street, Suite 2420          :
Phila., PA 19103                        :         **COMPLAINT**
                                        :
on behalf of himself and all            :     **CLASS ACTION**
other sellers of Class A PHLX           :
stock to either Susquehanna             :
International Group, LLP, or any         :     *08cv2805*
other person who possessed material,    :
non-public information as to the        :
value of PHLX stock at the time of      :
the relevant transaction                :
                            Plaintiffs, :
    vs.                                 :         Civil Action
                                        :
Susquehanna International Group, LLP     :
401 City Avenue                         :
Bala Cynwyd, PA   19004-1188            :
                                        :
Jeffrey Yass                            :
c/o Susquehanna International Group      :
401 City Avenue                         :
Bala Cynwyd, PA   19004-1188            :
                                        :
MEYER [SANDY] FRUCHER                    :
c/o Phila Stock Exchange                :
1900 Market Street                      :
Phila., PA 19103                        :
    and                                 :
XYZ, a legal entity or person           :
related to, or associated with,         :
Susquehanna International Group          :
                            Defendants. :

    The above named plaintiff, by his undersigned attorney,

hereby brings this Complaint and, in support of which, represents

the following:

## JURISDICTION

-1-

1.    This Court has subject matter jurisdiction of those claims set forth in this Complaint alleging a violation of the Securities Exchange Act, 15 U.S.C. §§ 78a, et seq., pursuant to 15 U.S.C. § 78aa.

**VENUE**

2.    Venue is properly laid in this district for the securities laws claims pursuant to 15 U.S.C. § 78aa as the transactions, events, or occurrences in issue giving rise to the claims raised herein all are, or were, within this district.

**JURY TRIAL DEMAND**

3.    Plaintiffs demand a trial by jury of all matters so triable.

**PARTIES & OTHERS IDENTIFIED HEREIN**

**PLAINTIFF:**

4.    Plaintiff Lewis M. Levin ("Plaintiff" or "Levin") is an individual who has a business address at the above address who owned seats on the Philadelphia Stock Exchange ("PHLX") prior to October 22, 2003. Plaintiff's last PHLX seat was sold on October 21, 2003 to an individual associated with Susquehanna International Group.

5.    Members of the plaintiff class are identified below in that section hereof captioned CLASS ACTION ALLEGATIONS.

-2-

**DEFENDANTS**:

6.   Upon information and belief, and, in particular, in reliance upon representations taken from their own website, defendant Susquehanna International Group, LLP, ("SIG"), is an entity headquartered at the address stated in the caption above.

7.   Upon information and belief, defendant Jeffrey Yass ("Yass"), has an office located at address stated in the caption and either owns or controls the largest ownership interest in SIG.

8.   Upon information and belief, defendant Meyer [Sandy] Frucher ("Frucher"), has an office located at address stated in the caption and is both the CEO of the PHLX and the chair of its Board of Governors.

9.   Defendant XYZ ("XYZ") is either a person or a legal entity whose identity is presently unknown to Plaintiff and who or which is related to, or has connections with, defendant SIG that acted for, or on behalf of, defendant SIG in purchasing Class A PHLX stock or, alternatively, defendant XYZ used information provided by defendant SIG in purchasing Class A PHLX stock.

## CLASS ACTION ALLEGATIONS

10.  NUMEROSITY: The number of members who will constitute the class definitely exceeds 50 and will probably exceed 100.

11.  CLASS MEMBERSHIP DEFINED: All persons, whether or not that person is an individual or legal entity, who either sold a PHLX seat or, alternatively, received Class A PHLX stock as a result of the demutualization of the PHLX and sold any of the Class A PHLX stock to SIG, or any person acting for, or on behalf of, SIG or who, at the time of said sale, possessed material, non-public information from SIG as to the value of either a PHLX seat or PHLX stock and did not disclose that information to the seller of said stock.

12.  The named plaintiff believes that he can be an adequate class representative and fairly represent all class members because Plaintiff:

a.  Levin purchased his PHLX seat before the time of any of the wrongdoing alleged herein and after Levin sold his PHLX seat Levin never purchased any Class A PHLX stock;

b.  Levin has never received any inside information; and

c.  Levin stands as a former PHLX seat owner in the same position as all other persons who either sold a PHLX seat or Class A PHLX stock to a buyer who acted on "inside" information.

13.  The COMMON QUESTIONS OF FACT are:

a.  what information was published by defendants to PHLX shareholders throughout the relevant period;

b.  what information was published by persons other than defendants to the PHLX shareholders throughout the relevant

-4-

period;

c.   what information was available as public information to the PHLX shareholders throughout the relevant period;

d.   what information should have been published by defendants to the PHLX shareholders at the times relevant hereto;

e.   what material, non-public information was possessed by a defendant when that defendant purchased either a PHLX seat or Class A PHLX stock from a member of the plaintiff class;

f.   any questions of reliance upon any representation made by defendants to PHLX seat owners or to PHLX shareholders; and

g.   damages suffered by PHLX seat owners and shareholders in connection with the relevant sales.

14. The COMMON QUESTIONS OF LAW are the violations of Rule 10b-5 under Section 10(b) of the Securities Exchange Act including, but not limited to, the:

a.   materiality of defendants' misrepresentations in, and omissions from, statements defendants Frucher and persons acting under the direction of defendant Frucher made to PHLX seat owners or shareholders regarding the value of PHLX seat or stock at various times relevant hereto; and

b.   The duty of defendant Frucher to disclose to PHLX seat owners and shareholders information regarding the value of

PHLX seats or stock at various times relevant hereto.

15.  The instant case is appropriate to bring as a class action under Fed.R.Civ.P. 23(b)(1)(B), because "adjudications with respect to individual members of the class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications".

## BACKGROUND INFORMATION ON PHLX

16.  The Philadelphia Stock Exchange, Inc., is registered under Section 78f of the Securities Exchange Act of 1934, 15 U.S.C. Chapter 2B, as a self-regulatory or self-regulating organization, ("SRO"). As an SRO, the PHLX is subject to, and regulated by, the Securities and Exchange Commission, ("SEC"), which was established under the Securities Exchange Act of 1934, as amended, at 15 U.S.C. §§ 78d, (the "Exchange Act" or "34 Act").

17.  The demutualization of the PHLX from a not-for-profit mutual association owned by its seat owners into a for-profit entity owned by its shareholders became effective on January 21, 2004, ("Demutualization").

18.  At all times relevant hereto, both before and after Demutualization, in addition to operating under the requirements of the Exchange Act, and the rules and regulations promulgated thereunder, the PHLX has also been required to operate within the structure of its own certificate of incorporation and by-laws.

19. At all times relevant hereto, both before and after Demutualization, the PHLX has had, and been governed by, a board of Governors, (the "PHLX Board" or "Board").

## VALUES OF THE PHLX AT TIMES RELEVANT HERETO

20. After becoming a member of the Board in 1997, Frucher became the CEO of the PHLX seats and chair of its Board in June 1998.

21. In 1998 and 1999 the price at which PHLX seats traded exceeded $300,000. Since there are 505 PHLX seats, on that basis the PHLX had a market value greater than $150 million.

22. During the period beginning with the second half of 2001 and continuing into 2002 the financial advisory firm of Keefe Bruyette & Woods, Inc., ("KBW") performed a valuation for the PHLX Board to advise it of the value of the PHLX for the purpose of the PHLX doing a deal with a technology firm. Upon information and belief, KBW advised the Board that the PHLX was worth between $250 and $350 million and that information was disseminated to the Board by Frucher and a PHLX employee, William Briggs, at a Board meeting.

23. The information KBW provided to the Board as to the value of the PHLX and even the fact that KBW provided this financial advisory service to the Board has never been made public nor disclosed to the entire group of PHLX seat owners or

-7-

shareholders.

24.    Beginning with a first payment due in June 2000, the Board imposed a $1,500 monthly tax on each PHLX seat, the monthly payments to continue for 36 consecutive months so that the last payment would be for the month of May 2003, to be paid to the PHLX and denoted these monthly payments a "capital contribution."

25.    The Board also initiated a "permit" system for the PHLX equity floor under the pretext that there were not enough PHLX seats available to satisfy the demand for access to the PHLX equity floor. The charge for this monthly permit was set at a price that was both less than the aforementioned monthly tax imposed by the Board on PHLX seats as well as the then prevailing monthly rate for leasing a seat.

26.    The monthly tax on seat ownership and the introduction of the option to pay a monthly fee to use a permit instead of being required to lease a seat in order to obtain the privilege of trading on the PHLX equity floor both contributed to the decline in the price at which PHLX seats traded. At the time the proposal to demutualize the PHLX was presented to the PHLX members and seat owners on October 22, 2003, by way of the Informational Memorandum on Demutualization published by the Board, PHLX seats were trading in the neighborhood of $10,000.

27.    On April 20, 2005 the PHLX Board informed the PHLX members and shareholders, via a memo, that the Board had rejected a bid to purchase the PHLX for $50,000,000. If the PHLX had been

-8-

sold for $50,000,000, each of the former seats that had become
via demutualization 100 shares of Class A PHLX stock would have
been purchased for just under $100,000.

28.   The PHLX Board then proceeded to do two (2)
transactions that summer, the first on June 15, 2005 and the
second announced on August 16, 2005, although the Board has also
stated that the transactions were part of a single transaction
executed in two steps for logistical reasons, in which a non-
dilutable 98.4% interest in the PHLX was sold to six firms for
$33.75 million. [These transactions were structured to require
each of the six firms to bring a certain level of "order flow" to
the PHLX floors for a six month period in order to receive their
full interest in the PHLX but the so-called goals that were
required to be met were purely illusory and solely designed to
camouflage the low price at which these interests were actually
sold.]

29.   Concomitant with the announcement of the second deal on
August 16, 2005, the Board announced that the PHLX would make a
self tender to retire Class A PHLX stock at $90,000 per 1oo
shares. This tender offer was formalized on September 22, 2005
when it was published to PHLX shareholders.

## INTRODUCTORY STATEMENT ON THE CLAIMS HEREIN

30.   At its core, this case is about theft by deception. The
deception, (the "Deception"), contained, but was not limited to,

the following components:

a.   the true value of the PHLX, $250 to $350 million, was kept concealed from plaintiff and members of the plaintiff class;

b.   the viability of the PHLX was misrepresented as being questionable at best, and, at worse, in danger of imminent failure; and

c.   the future of the PHLX could be salvaged through equity capital investments if only the PHLX had a "currency" to use, i.e., stock, to facilitate those investments and that would be made available with Demutualization.

31.   A misrepresentation that was interrelated to the omission of the true value of the PHLX was the value to a PHLX seat owner of appraisal rights under Delaware law because the value of a seat was its pro rata share of the PHLX, one part in five hundred five. The PHLX seat owners who received an award of their appraisal rights would then have had to pay a pro rata share, based upon the number of seats each owned, of whatever costs might have been imposed upon them from an appraisal proceeding. (This statement, for the sake of simplicity, disregards the possibility that seats with and those without the privilege to trade in options attached thereto might have received different awards from an appraisal proceeding.)

32.   The Deception was used to convince the PHLX seat owners that the only available option to keep the PHLX in operation was

to demutualize the PHLX.

33.   The Deception was used to convince the PHLX seat owners to become a shareholder in the demutualized PHLX and not exit by way of an appraisal proceeding in Delaware Chancery Court because an appraisal award would have resulted in the PHLX having had to pay to each such exiting PHLX seat owner a minimum of $500,000 per seat.

34.   Even after the PHLX was demutualized, the real value of the PHLX was still kept concealed from the former PHLX seat owners to prevent the former seat owners from bringing claims for the wrongful taking of the value of their equity interests in the PHLX.

35.   The Deception could not have succeeded without the active participation of KBW because an opinion on the proposed plan of Demutualization was needed from an entity presenting itself as an independent financial advisor.

36.   The KBW Advisory stated that KBW had conducted an analysis of the financial situation of the PHLX and, based upon that analysis, endorsed all of the representations and recommendations that had been made by the PHLX Board including, in particular:

a.   that the continuing viability of the PHLX was questionable; and

b.   demutualization was not only the best, but the only option available.

-11-

37.  The main misrepresentations and omissions of the KBW
Advisory were:

a.  the KBW Advisory omitted a statement of the prior
financial advisory and investment banking services KBW had
performed for the PHLX so as to create the false impression that
KBW was providing an "independent" evaluation of the viable
alternatives available to the PHLX;

b.  the KBW Advisory misrepresented the viability of
the PHLX by presenting it as questionable. In fact, the KBW
Advisory failed to disclose the PHLX had a surplus of
approximately $27 million at the very same time KBW was
questioning its financial viability;

c.  the KBW Advisory did not disclose that KBW had
performed, and then provided to the PHLX, valuations of the PHLX
and assets of the PHLX nor the content of those valuations. The
KBW valuation of the PHLX, as was reported by Frucher to the PHLX
Board in 2002 - but never disclosed to the PHLX seat owners -
gave the value of the PHLX as being between $250 and $350
million.

d.  the KBW Advisory failed to disclose that KBW also
stood to financially benefit from Demutualization. and

e.  the KBW Advisory failed to disclose that KBW had
received an indemnification agreement from the PHLX to protect
KBW from any adverse results from publishing the KBW Advisory.

-12-

**Count 1: VIOLATION OF RULE 10b-5 IN THE PURCHASES OF PHLX SEATS AND STOCK BY SUSQUEHANNA INTERNATIONAL GROUP AND PERSONS ALLIED WITH SUSQUEHANNA INTERNATIONAL GROUP**

38.   Plaintiffs incorporate by reference herein all of the preceding just as if such were once again fully set forth herein.

39.   The factual basis for the allegations that follow concerning what occurred at PHLX Board meetings and KBW's dealings with the PHLX was provided by a confidential informant who personally witnessed or participated in those occurrences or was directly told of such by a participant in the relevant occurrence.

40.   In, or before, July 2001 the PHLX Board entered into negotiations with Linsang Partners, an entity that was, among other things, exploring the possibility of a mutually beneficial arrangement with the PHLX and also considering investing in, or acquiring an interest in, the PHLX.

41.   KBW was retained in July 2001 by the PHLX Board to provide financial advisory, and investment banking, services for the PHLX Board in the negotiations with Linsang Partners, (the "July 2001 Contract"), which is believed to be the first services for which the Board contracted with KBW.

42.   Pursuant to the July 2001 Contract, KBW performed, and then provided to the PHLX Board, a valuation of the PHLX for the Board to use in its negotiations with Linsang Partners.

43.   Beginning with the July 2001 Contract KBW performed

-13-

services for the PHLX in a series of contracts including one in which KBW was to be compensated on a sliding scale for "monetizing" or selling assets of the PHLX, such as financial automation, with fees that could exceed $1,000,000 for a deal on one such PHLX asset. In other words, the compensation to be paid to KBW on any such deal was related to the value of the relevant PHLX asset.

44. At a Board meeting in 2002 that, among other matters, considered the Linsang Partners negotiations, Frucher and Briggs, who was at all times relevant hereto also a member of PHLX senior management, informed the Board that the value of the PHLX was between $250 and $350 million.

45. As a follow-up to this very same Board meeting, KBW, or possibly KBW with Deloitte & Touche, was retained to vet each PHLX Board member on the Linsang Partners deal by meeting with and informing each Board member personally.

46. At this same Board meeting, Frucher discussed the need for the PHLX to have a "currency" for use in transactions such as the one contemplated with Linsang Partners.

47. Beginning in June 2000 and ending in May 2003, the PHLX Board had imposed a capital contribution tax on each PHLX seat of $1,500 monthly, purportedly to pay for the new technology that the PHLX needed to stay competitive.

48. In the summer of 2003 Frucher communicated to PHLX members and seat owners that if Demutualization was not approved,

-14-

then the capital contribution tax on each PHLX seat of $1,500 monthly would be restarted, and he subsequently took steps to do so including, but not limited to, obtaining authorization from the PHLX Board and communications with the SEC on restarting the monthly capital contribution tax on PHLX seats.

49.  On January 21, 2004, only after the effective date of Demutualization, did the PHLX first reveal to the seat owners that the new technology for the PHLX, the purported reason for the imposition of the tax on seats, had been fully paid for and was operational and that the PHLX had a surplus of more than $27 million.

50.  Accumulating a surplus of more than $27 million was contrary to how the PHLX was to operate as a not-for-profit mutual association.

51.  In the Summer of 2005, the demutualized PHLX consummated a deal with six wall street firms who collectively made a total payment over to the PHLX of $33.75 million and collectively received a non-dilutable 89.94% equity interest in the PHLX as well as other valuable rights and entitlements with respect to the PHLX, (the "Summer 2005 Deal").

a.   In addition to the total cash payment to the PHLX of $33.75 million, the PHLX purportedly received "valuable" order flow from the six wall street firms about which more will be said in what follows. And

b.   In addition a non-dilutable 89.94% equity interest

-15-

in the PHLX, the six wall street firms received certain rights
and entitlements with respect to the PHLX such as guaranteed
representation on the PHLX Board; some control over the
compensation, perquisites, and benefits to be paid to senior PHLX
management; limitations on further grants of equity to senior
PHLX management or the Board; and certain rules, such as that
concerning directed orders, enacted by the PHLX in its capacity
as an SRO, for the direct and exclusive benefit of these six
firms.

    52.  The Summer 2005 Deal is the deal for which the PHLX
demutualized and the September 22, 2005 Tender Offer by the PHLX
to retire Class A PHLX stock owned by former seat owners revealed
the following:

        a.  At the time of the deal at least one half, and as
much as three quarters, of the gross sum received by the PHLX,
$33.75 million, was dedicated to retiring the equity interests of
the former PHLX seat owners;

        b.  The costs to the PHLX, both legal and other, to
first demutualize and then do the Summer 2005 Deal was
approximately $3 million, with the fee to KBW for just the KBW
Advisory being $450,000; and

        c.  If the full amount dedicated to retiring stock
from the former PHLX seat owners had been paid out, after taking
into consideration all of the costs involved, the PHLX would have
netted from this investment by the six wall street firms at most

-16-

$5 to $6 million, essentially insignificant to the PHLX as a going concern, and less than 25% of the more than $27 million in surplus cash the PHLX already had on hand.

53.   The alternative explanation given by the PHLX as well as the six wall street firms for doing the Summer 2005 deal was that by the six wall street firms acquiring equity positions in the PHLX, those firms would be incentivized to bring order flow to the PHLX floors and the penultimate source of the well being of a securities exchange is order flow. This rationale for the Summer 2005 deal is readily seen to be just as great a pretext as the first:

a.   For whatever order flow the six wall street firms brought to the floor of the PHLX, those firms received more generous compensation for bringing that order flow to the PHLX than they would have received by taking that order flow elsewhere due to the PHLX having, at all times relevant hereto, the highest payment for order flow program of all exchanges;

b.   This explanation for the deal that was given to the public by Frucher, the PHLX Board, and the six wall street firms that the PHLX floor would now receive new order flow as a direct and immediate result of those firms being incentivized through acquiring their equity interests in the PHLX was demonstrably false as is revealed by the fact that two of the six wall street firms did not bring order flow to the PHLX floor, even though they had been supposedly "incentivized" to do so

-17-

through their equity interests in the PHLX, until rules were
enacted enabling those two firms to directly profit from the
orders they brought to the PHLX floor; and

c.   Even had the purported commitment to bring order
flow to the PHLX floor been real, since the commitment was for
six months of order flow, it did absolutely nothing to ensure the
long term viability of the PHLX and it was the long term
viability of the PHLX that had been represented to be the
principal concern behind not only Demutualization but all of the
actions taken by Frucher and the Board;

54.   PHLX seats did not trade in an efficient market. While
PHLX seats were never listed on any national exchange, almost
anyone able to pay the purchase price could buy a PHLX seat.

55.   PHLX stock has never traded in an efficient market. The
market for PHLX stock is even less liquid and more constricted
than was the market for PHLX seats as only accredited investors,
within the meaning of the Securities Act of 1933, may directly
participate in this market.

56.   In the period between the publication of the Info Memo
and the two votes on Demutualization, a PHLX seat with the
privilege to trade options attached thereto sold for a low of
$12,000.

57.   The first transactions in PHLX stock after the
effective date of Demutualization were at prices less than
$20,000. In fact, PHLX stock did not sell for a price above

-18-

$20,000 until October or November 2004.

58.   However, beginning at a time before Demutualization and continuing through the Fall of 2005, SIG and persons allied with SIG sought and purchased first PHLX seats and then PHLX stock.

59.   These purchases of first PHLX seats and then PHLX stock by SIG and those allied with SIG were due to SIG having received material non-public information from Frucher and others at the direction of Frucher.

60.   In addition to the pattern of purchases made by SIG there is substantial evidence that SIG received material non-public information about the PHLX and that it was from Frucher. In particular, the individual with control over SIG, Jeffrey Yass, complained to the PHLX Board that Frucher had "reneged" on his deal with Yass. Frucher, in response to this charge, brought in the law firm of Wilkie, Farr & Gallagher to investigate said claim which had the ultimate effect of implicitly explaining to Yass that if Yass pursued his charges against Frucher, Yass would also be "destroyed" by those same charges for having participated in the same wrongdoing.

61.   Additionally, as is shown by Exhibits "1" and "2" hereto, SIG was involved in devising the wrongful schemes with Frucher from the very start.

62.   Having devised the wrongful scheme with Frucher and having had Frucher inform SIG as to the value of the PHLX and what potential deals were being pursued by the PHLX, SIG, and its

-19-

allies, used that information to their own advantage.

WHEREFORE, plaintiffs respectfully demand that judgment be entered in favor of plaintiffs and against SIG jointly and severally, for violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder for its actions, as set forth above, in connection with the demutualization of the PHLX. That judgment be entered in an amount that fully compensates plaintiffs for their losses, plus costs of court and, in addition thereto, this Court award whatever other, and further, relief this Court deems just and necessary under the circumstances.

Dated: June 16, 2008

Respectfully submitted,

Steven B. Mirow
PA ID# 38701
249 South 12th Street
Philadelphia, PA 19107
(215) 923-1301